Filed 5/22/25  In re A.K. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.K., a Person Coming Under the Juvenile Court Law. | A170918 |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.B.,<br><br>        Defendant and Appellant. | (Humboldt County Super. Ct. Nos. JV2300107, JV2300108) |

Defendant E.B. appeals from the juvenile court's orders denying his postconviction petitions for access to juvenile records pursuant to Welfare and Institutions Code[1] section 827.  E.B. was found guilty of attempted murder, assault with a deadly weapon, and burglary following a jury trial in 2019.  In *People v. Battersby* (Nov. 20, 2020, A159213) [nonpub. opn.] (*Battersby*), we stayed E.B.'s conviction for burglary pursuant to Penal Code section 654 but otherwise affirmed the judgment.  He has since filed numerous habeas petitions in different courts, claiming ineffective assistance

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

of counsel and prosecutorial misconduct. In connection with one such petition he filed below, E.B. sought access to certain juvenile records, arguing that they contain information that "impeaches [a] key prosecution witness . . . and proves [the witness] perjured himself at [E.B.'s] trial." The trial court denied E.B.'s request for an in camera review of those records and held that he had not shown good cause for their release. We disagree and reverse.

## I. BACKGROUND

A. Facts and Prior Appeal[2]

The following facts are taken from our opinion in *Battersby*:[3] We have only included those facts relevant to this appeal.

"A. People's Case

"On December 2, 2016, victim [J.M.] met [L.L.], who allowed [J.M.] to sleep on his living room couch. At approximately 11:30 p.m., [J.M.] went to sleep. [¶] Around 5:00 a.m. on December 3, 2016, [J.M.] awoke, finding [E.B.] with his arm on [J.M.'s] chest and a knife to [J.M.'s] throat. [E.B.] threatened [J.M.]: 'I'm going to kill you for what you've done to our family, what you've put me through.' ([E.B.] was dating [J.M.'s] daughter, [Ji.M.].)

"With his left hand, [J.M.] grabbed [E.B.'s] right hand, which was holding the knife; and with his right hand, [J.M.] grabbed [E.B.'s] testicles. [E.B.] tried to gouge [J.M.'s] eye out with his left hand. [J.M.] took the knife from [E.B.] and 'put [him] on the floor,' where the two fought . . . [¶] [L.L.] entered the living room, grabbed [J.M.], and asked [J.M.] what he was doing. [J.M.] replied that [E.B.] was 'that piece of shit that I've been telling you about.' [L.L.] let go of [J.M.], grabbed [E.B.], and kneed him in the face . . .

---

[2] We deny respondent's request for judicial notice of various "appellate and writ matters" in other court files because the request was not made by separate motion. (Cal. Rules of Court, rule 8.252(a).)

[3] The parties do not dispute the accuracy of this statement of facts.

Eventually, [L.L.] and [J.M.] got off of [E.B.] and threw him out the front door. [¶] [J.M.] sustained a cut extending from his Adam's apple to his ear, along with abrasions to his face, a swollen eye, a bloody nose, and multiple lacerations.

"B. Defense Case

"[E.B.] testified that he first met [J.M.] when [J.M.] arrived unannounced at his and [Ji.M.'s] house in December 2015. [J.M.] stayed for less than a week on the couch. The next time [J.M.] visited was Father's Day 2016, again unannounced, staying nearly a month. During this visit, [J.M.] became aware that [E.B.] and [Ji.M.] were using heroin and confronted them about it. According to [E.B.], [J.M.] was 'very abusive, hostile and threatening' and threatened [E.B.'s] life more than once . . . .

"By [E.B.'s] account, in the morning hours of December 3, 2016, [he] and [Ji.M.] purchased and injected heroin. Around 4:00 a.m., [E.B.] received a phone call from [L.L.], his cocaine dealer, and made plans to go to [L.L.'s] residence around 5:45 a.m. . . . [E.B.] drove to [L.L.'s] residence without [Ji.M.]. When he got there, [E.B.] and his dog got out of the car, and [E.B.] unleashed the dog inside a fenced area. [E.B.] followed [L.L.] to his bedroom, where [L.L.] handed [him] an 'eight ball' bag of cocaine in exchange for $240 and a pound of pot. [E.B.] dumped some of the cocaine onto a mirror . . . which [E.B.] and [L.L.] consumed.

"[E.B.] then heard his dog barking viciously in the front yard. He left the room to check on the dog and saw a figure in front of the door. The person asked, 'Where is [Ji.M.]?' [E.B.] recognized [J.M.'s] voice. [E.B.] headed for the door and tried to get around [J.M.], but [J.M.] pushed [E.B.] back. [E.B.] tried to get past [J.M.] again, but [J.M.] hit [E.B.] with a hard object, knocking him to the floor. [J.M.] started beating [E.B.]. At least one

3

other person, who sounded like [L.L.], beat him as well. [J.M.] said, 'I'm going to kill this junkie piece of shit.' [E.B.] ran out the front door.

"C. People's Rebuttal

"Deputy Luke Mathieson testified that he did not find controlled substances in [L.L.'s] house, and no one in the house indicated there were any. Nor did Mathieson find the $240 [E.B.] supposedly gave [L.L.].

"On the day of the incident, [E.B.] and [Ji.M.] had given Deputy Mathieson a different account of what occurred. They claimed that [E.B.] had gone to [L.L.'s] house to ask [J.M.] for [Ji.M.'s] hand in marriage. [E.B.] knocked on the front door, and [J.M.] opened it. When [E.B.] asked [J.M.] for [Ji.M.'s] hand in marriage, [J.M.] responded, 'Hell no, junkie chomo' and 'jumped' [E.B.], punching him repeatedly. However, the deputy examined [J.M.'s] hands and did not see any wounds consistent with having punched anyone.

"D. Verdict and Sentence

"The jury found [E.B.] guilty of attempted murder, assault with a deadly weapon, and first degree burglary. [¶] The court sentenced [E.B.] to prison for seven years to life on the attempted murder conviction. [Citation.] The court also imposed a four-year term for assault with a deadly weapon . . . and a six-year term for burglary . . . , ordering those terms to be served concurrently with the indeterminate term. The term on the assault was stayed pursuant to [Penal Code] section 654; the term on the burglary was not." (*Battersby*, *supra*, A159213.)

B. <u>Petitions for Writ of Habeas Corpus</u>

In May 2022, E.B. filed a petition for writ of habeas corpus in the United States District Court for the Northern District of California, challenging his state court convictions. The petition included claims of

4

ineffective assistance of his trial and appellate counsel as well as the "suppression of various exculpatory evidence by the prosecution." In January 2023, the district court stayed this action at E.B.'s request so he could "exhaust[] all claims in the state courts."

Roughly one month later, E.B. filed another petition for writ of habeas corpus in the trial court (subject petition). As relevant to this appeal, the petition argued that E.B.'s trial counsel was ineffective in failing to obtain exculpatory and impeachment evidence contained in juvenile records. According to the petition, J.M. testified at trial that he had reported Ji.M., his daughter, and E.B., her boyfriend, to child welfare services (CWS). As a result, his grandchildren, A.K. and C.K., were removed from Ji.M. and E.B.'s home.[4] The petition continued that the prosecution's theory at trial was that this report to CWS supplied the motive for E.B.'s attempted murder of J.M. E.B. argued that information in the juvenile records would have shown that the CWS report was made anonymously and that A.K. and C.K. were not removed from Ji.M. and E.B.'s home, thereby impeaching J.M. The petition further alleged that the prosecutor committed misconduct by suppressing this *Brady*[5] exculpatory evidence.

The following month, E.B. filed a petition for writ of mandamus in the trial court, requesting that the prosecution fully comply with the court's prior order granting postconviction discovery under Penal Code section 1054.9 and for a stay of the subject petition until the prosecution complied. The court denied the petition on the grounds that the prosecution did not possess the requested records and was not obligated to "rebuild [E.B.'s] case file." The court noted that the prosecution "has complied with the discovery requests

---

[4] E.B. is not the father of A.K. or C.K.

[5] *Brady v. Maryland* (1963) 373 U.S. 83.

and represented . . . that it has provided all the records that it possesses."
E.B. then filed several requests for an order to show cause and for a judgment
of contempt against the prosecution. He continued to request a stay of the
subject petition. The court denied these requests on the grounds that E.B.
presented no evidence that the prosecution violated the postconviction
discovery order and that he filed this request *two* years after the original
discovery order was issued.

In September 2022, the prosecution filed an informal response to the
subject petition, denying it had suppressed any evidence and arguing that
"[n]one of the requested [*Brady*] items were in [its] actual or constructive
possession." The response further contended that the "[d]efense had equal
access to any of the requested materials in that they could have filed an 827
petition for CWS records." E.B. requested several extensions to file his reply
brief, arguing that he needed additional time to enforce the postconviction
discovery order so he could properly reply to the prosecution's response. The
trial court granted numerous extensions, the latest of which was until
September 26, 2023. E.B. thereafter attempted to file two further requests
for an extension, which were rejected by the court clerk. It is unclear
whether the court granted any further extensions.

C. <u>Section 827 Petitions</u>

In or around June 2023, E.B. filed two section 827 petitions—one
requesting access to A.K.'s juvenile records and the other requesting access to
C.K.'s records. In the petitions, E.B. contended that those records contained
information needed to support his ineffective assistance of counsel and *Brady*
violation claims in the subject petition. On July 28, 2023, the juvenile court
summarily denied the petitions, holding that E.B. failed to show "good cause
for the release of the requested records" and "has not met the notice

6

requirements of rule 5.552(c) of the California Rules of Court."[6]  The court further found that the "[r]equest for records is overbroad or records sought are insufficiently identified."

E.B. filed a petition for writ of mandamus in this court, challenging the juvenile court's summary denials.  We denied the petition because E.B. had "not demonstrated the propriety of reviewing those orders by extraordinary writ" and because the "challenged orders were appealable."  (*Battersby v. Superior Court*, Oct. 26, 2023, A168934.)  We noted that E.B. could also file "a new section 827 petition that address[ed] the deficiencies outlined in the [trial] court's July 28, 2023 order" as another possible remedy.

Following our order denying the writ petition, E.B. filed two new section 827 petitions, which requested, among other items, all documents from CWS concerning (1) a complaint made by J.M. that "[A.K.] and [C.K.] were subject to neglect and unsafe living conditions while living with" Ji.M. and E.B., and (2) the investigation of the complaint, including "that there was no conclusive evidence of abuse, neglect, or unsafe living conditions found" and that A.K. and C.K. were not removed from their home.  He further sought records "demonstrating that the complaint was reported to [Ji.M. and E.B.] as an anonymous complaint."  E.B. reiterated that this information would impeach J.M.'s testimony and destroy the prosecution's theory on motive.

Respondent Humboldt County Department of Health & Human Services (Department) objected, arguing that while E.B.'s new requests were narrower than his previous requests, they were still vague and overly broad. The Department further argued that access to these records "would result in an unwarranted invasion of the children's privacy" and that "an in camera

---

[6] Further references to rules are to the California Rules of Court.

review . . . would be a waste of judicial resources as [E.B.] is not entitled to the records."

On May 10, 2024, the juvenile court again summarily denied the section 827 petitions without an in camera review on the ground that "[E.B.] has not shown good cause for the release of the requested records." E.B. filed a notice of appeal that was received by the court on July 11, 2024.

## II. DISCUSSION

### A. Timeliness of Appeal

The Department initially contends that E.B.'s appeal may not be timely because his notice of appeal was filed on July 11, 2024—62 days after the juvenile court denied his section 827 petitions. We are unpersuaded.

Generally, "a notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed." (Rule 8.406(a)(1).) However, if a notice of appeal is mailed for filing by an inmate, it is deemed timely if "the envelope shows that the document was mailed or delivered to custodial officials for mailing within the period for filing the document." (Rule 8.25(b)(5).) Here, the proof of service for E.B.'s notice of appeal shows that it was mailed within the 60-day period on July 9, 2024. The Department counters that there is a discrepancy as to when the notice was mailed because the date stamp on the accompanying envelope appears to read July 10, 2024. But it is well established, with respect to the filing of a notice of appeal, that any "[d]oubts should be resolved in favor of the right to appeal." (*People v. Tucker* (1964) 61 Cal.2d 828, 832.) Indeed, the jail may not have processed E.B.'s notice of appeal for mailing until July 10 even though E.B. gave it to jail staff on July 9. We therefore find E.B.'s appeal timely.

8

B. <u>Section 827 Petitions</u>

Turning to the merits, E.B. contends that the juvenile court erred in denying his section 827 petitions without conducting an in camera review of the requested juvenile records for *Brady* exculpatory and impeachment evidence.  We agree.

1. *Law and Standard*

"To comply with *Brady* constitutional due process requirements, the prosecution must disclose exculpatory and impeachment evidence that is favorable to the accused and material on the issue of guilt or punishment." (*J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1334 (*J.E.*).) "[E]xculpatory evidence is evidence that tends to exonerate the defendant from guilt" while impeachment evidence is evidence "that might undermine a prosecution witness's credibility."  (*Id*. at p. 1335.)  "Although the government's *Brady* obligations are typically placed upon the *prosecutor*, the courts have recognized that the *Brady* requirements can also be satisfied when a *trial court* conducts an in camera review of documents containing possible exculpatory or impeachment evidence."  (*J.E.*, at p. 1336.)

Section 827, subdivision (a)(1)(Q) governs access to confidential juvenile records and permits an unauthorized person to petition the juvenile court for access to these records.  "The court must review the petition and, if petitioner does not show good cause, deny it summarily."  (Rule 5.552(d)(1).) "If petitioner shows good cause, the court may set a hearing." (Rule 5.552(d)(2).)  But regardless of whether a hearing is set, "if the court determines that there *may* be information or documents in the records sought to which the petitioner may be entitled, the juvenile court . . . *must* conduct an in camera review of the juvenile case file and any objections and assume that all legal claims of privilege are asserted."  (Rule 5.552(d)(3),

9

italics added.) In determining whether to authorize disclosure, the court "must balance the interests of the child . . . , the interests of the petitioner, and the interests of the public" (rule 5.552(d)(4)) and may permit access "only insofar as is necessary, and only if petitioner shows by a preponderance of the evidence that the records requested are necessary and have substantial relevance to the legitimate need of the petitioner" (rule 5.552(d)(6)).

"Generally, a juvenile court has broad and exclusive authority to determine whether and to what extent to grant access to confidential juvenile records pursuant to section 827." (*In re Elijah S.* (2005) 125 Cal.App.4th 1532, 1541.) We review the juvenile court's order for abuse of discretion. (*Ibid.*)

### 2. *Analysis*

In support of his section 827 petitions, E.B. argues that there is evidence in the requested juvenile records that would have discredited J.M.'s trial testimony and weakened the prosecution's theory regarding E.B.'s motive for attempting to murder J.M.[7] Specifically, he contends the requested records contain evidence that, consistent with his testimony and contrary to J.M.'s trial testimony, J.M.'s CWS report was anonymous, his report was determined to be unfounded, and the children were never removed from Ji.M. and E.B.'s home. E.B. further explains that this impeachment evidence supports his pending petition for habeas relief based on ineffective assistance of counsel and *Brady* violations. On their face, E.B.'s section 827 petitions appear to allege facts sufficient to establish that

---

[7] Although E.B. further argued that the prosecution failed to provide him these files pursuant to the trial court's postconviction discovery order, we note that the prosecution was prohibited from doing so absent approval by the juvenile court. (§ 827, subd. (a)(4).)

the records may contain information to which he is entitled, and that the juvenile court should have conducted an in camera review of those records before ruling on these petitions. (Rule 5.552(d)(3).) Indeed, "in camera review under section 827 is a proper mechanism to resolve a defense *Brady* disclosure request involving information in a juvenile file." (*J.E.*, *supra*, 223 Cal.App.4th at p. 1338.)

The Department counters that the juvenile court could have concluded that E.B. failed to show good cause for the release of the juvenile records for many reasons. We are unpersuaded, noting that the court never explained why it declined to conduct an in camera review.

The Department first argues that the juvenile court could have found "that the information and exhibits submitted by E.B. were incomplete and/or inadequate" because E.B. did not attach the full subject petition with all supporting exhibits and only provided select excerpts from the trial transcripts in his underlying criminal case. But the documents E.B. did submit in support of his section 827 petitions made clear that he had a pending habeas petition that alleged claims of ineffective assistance of counsel and *Brady* violations based on the alleged suppression of evidence. Those documents also established that the prosecution's theory at trial was that E.B. attempted to murder J.M. because J.M. reported him and Ji.M. to CWS and tried to get CWS to remove A.K. and C.K. from their home. E.B. denied this and testified at trial that the CWS complaint was made anonymously. Thus, documents in the juvenile records regarding the anonymity of the CWS complainant; what, if anything, CWS told Ji.M and E.B. about that complainant; and whether CWS removed any children from Ji.M. and E.B.'s home, could provide exculpatory and impeachment evidence.

11

The Department next argues that the juvenile court could have found that the records were not "necessary" or did not "have substantial relevance to the legitimate need of [E.B.]" because he presented no evidence of a *Brady* violation. (Rule 5.552(d)(6).) But as E.B. points out, this argument "puts the cart before the horse." Indeed, E.B. requested access to the juvenile records *in order to support* the claim in his habeas petition that a *Brady* violation occurred. In any event, the juvenile court is obligated to conduct an in camera review if "there *may* be information or documents . . . to which [E.B.] *may* be entitled." (Rule 5.552(d)(3), italics added.)

The Department also contends that the juvenile court could have concluded that the information sought by E.B. was redundant or extraneous because E.B. already testified at trial that the CWS complaint was made anonymously and that A.K. and C.K. were not removed from their home by CWS. E.B.'s and J.M.'s accounts of what occurred during the night of the attempted murder were quite different, and the jury necessarily found J.M., the key witness at E.B's trial, more credible in finding E.B. guilty of attempted murder. Evidence corroborating E.B.'s testimony and, in turn, undermining J.M.'s credibility with respect to the CWS report and CWS's actions in response to that report constitutes impeachment evidence, regardless of whether it is "redundant" of E.B.'s testimony. (*J.E., supra,* 223 Cal.App.4th at p. 1335.)

The Department further asserts that the juvenile court could have determined there was no "legitimate need" for the requested records because the prosecution did not contradict or attack E.B.'s testimony during trial. But J.M., the prosecution's primary witness at trial, did contradict E.B.'s testimony. Moreover, the prosecution did question E.B.'s testimony. In the trial excerpts provided by E.B., the prosecution questioned E.B. about CWS

12

removing the children from his and Ji.M.'s home and E.B.'s attempt to kill J.M. after J.M. made his report to CWS. The prosecution also argued during closing that "[J.M.] reported [Ji.M. and E.B.] to [CWS] and that made them upset . . . [E.B.] entered to try to kill [J.M.]. He said, 'I'm going to kill you for what you did to us.' "

Lastly, the Department argues that the juvenile court could have determined that two of the cases cited by E.B. below, *J.E.*, *supra*, 223 Cal.App.4th 1329 and *In re Jenkins* (2023) 14 Cal.5th 493, were factually distinguishable. We are again unpersuaded and do not see how those distinctions, if the court even drew them, would justify the court's failure to conduct an in camera review. For example, the Department highlights that in *J.E.*, the request for juvenile records occurred "while the criminal trial was pending, and not in connection with a habeas corpus petition." But our high court in *Jenkins* acknowledged that section 827 is the proper procedure for accessing juvenile records necessary to support a habeas petition alleging *Brady* violations. (*Jenkins*, at p. 526.) Nor does the fact that the juvenile records in *Jenkins* "belonged to the victim and key witness" have any bearing on whether the juvenile court was obligated to conduct an in camera review in this case. That the records here belong to third parties (A.K. and C.K.) does not change the fact that they contain potentially exculpatory or impeachment evidence to which E.B. may be entitled.

### III. DISPOSITION

The May 10, 2024 orders denying E.B.'s section 827 petitions are reversed, and the juvenile court is directed on remand to conduct an in camera review of the requested juvenile records. We take no position on whether the petitions should ultimately be granted.

13

CHOU, J.

WE CONCUR:

SIMONS, ACTING P. J.

BURNS, J.

A170918
*In re A.K.*